J.B. Youngblood and Lucille Youngblood appeal from a judgment ordering specific performance of a real-estate contract. We affirm.
 Procedural History
On September 22, 2005, Emory Earl Ellis sued J.B. Youngblood and Lucille Youngblood, alleging that the Youngbloods had failed to convey certain property located in Pike County ("the property") to him pursuant to the terms of a real-estate contract ("the contract"). The complaint requested that the court order specific performance of the contract. On October 21, 2005, the Youngbloods answered the complaint.
On November 20, 2006, a bench trial was conducted, and on December 8, 2006, the trial court entered a judgment ordering specific performance of the contract. The Youngbloods filed a motion to alter, amend, or vacate the judgment or, in the alternative, for a new trial on December 20, 2006. That motion was denied the same day. On January 29, 2007, the Youngbloods filed their notice of appeal to the Alabama Supreme Court. On February 15, 2007, the Supreme Court transferred the appeal to this court, pursuant to § 12-2-7, Ala. Code 1975.
 Facts
In December 2004, Ellis, a real-estate broker, learned that the Youngbloods were interested in selling the property. Thereafter, Ellis entered into negotiations with the Youngbloods. Ultimately, the parties reached an agreement, and Ellis's real-estate attorney, James Thomas, drafted the contract based on their agreement. The contract reads:
 "REAL ESTATE CONTRACT
 "THIS AGREEMENT made and entered into by and between Earl Ellis, hereinafter called the `Purchaser' and JB Youngblood and Lucille Youngblood, hereinafter called the `Sellers'.
 "WITNESSETH:
 "The Purchaser[] agree[s] to buy and the Seller[s] agree[] to sell and convey, on the terms hereinafter provided, the following described property, to wit:
 "40 plus or minus acres house and trailer located in Section 17, Township 10, Range 21, Pike County, Alabama.
 "The purchase price shall be $70,000.00 payable at closing. The closing fees will be paid as follows:
 "All costs associated with the closing to include attorney, survey, recording, deed preparation and lending fees will be paid by the [Purchaser]. Taxes will not be prorated. *Page 1124 
 "Seller[s] hereby acknowledge[] $1,000.00 earnest money held by the closing attorney James N. Thomas.
 "The Seller[s] agree[] to deliver to the Purchaser a Warranty Deed at closing, free of any and all encumbrances.
 "Purchaser acknowledges property is being purchased `AS IS' and that no warranties or representations have been made as to the condition or quality.
 "If the Sellers' title is not found to be merchantable, any earnest money shall be refunded to the Purchaser and this contract shall terminate. If the Sellers' title is merchantable and the Purchaser fails or refuses to consummate the sale within the period allowed, any earnest money shall be retained by the Seller[s] as liquidated damages for the breach of this contract, or the Seller[s] may enforce specific performance of this agreement.
 "This contract will expire within 45 days of its execution date."
(Emphasis omitted.)
On December 9, 2004, Thomas mailed the contract to J.B. Youngblood, and on December 21, 2004, the Youngbloods executed the contract. The Youngbloods then mailed the signed contract back to Thomas, and Ellis signed the contract on December 27, 2004. It is undisputed that Ellis paid the $1,000 earnest money to Thomas as required by the contract, and at the time of trial, Thomas was still holding that money in trust.
At trial, Thomas testified that J.B. Youngblood had mentioned that he wanted to close around January 15, 2005. J.B. Youngblood, however, testified that Ellis told him that they would talk about closing at a later date. Lucille Youngblood testified that it was understood from the beginning of the transaction that the closing would be done in person and not by mail.
Thomas testified that, on December 29, 2004, he sent a letter to J.B. Youngblood along with the fully executed contract. The letter, which was introduced as evidence at trial, stated: "Enclosed is the fully executed contract for your file. In our prior conversation, you mentioned you would be in town for closing around January 15. Please contact my office at your earliest convenience to set a exact closing `; date and time." The Youngbloods, however, testified that they did not receive the December 29, 2004, letter.
Thomas testified that he never heard back from J.B. Youngblood to discuss the closing date, so he telephoned him to confirm a closing date. Thomas testified that during that conversation Youngblood informed him that he was not able to travel to Alabama to close because he was having some flooding issues in his home state.[1] Thomas testified that Youngblood said that he would get back with Thomas concerning when he could close. Thomas testified that he offered to send the closing documents to Youngblood via a private carrier so that he would not have to travel to Alabama but that Youngblood stated that he wanted to close in person.
Thomas testified that he subsequently contacted J.B. Youngblood again to inquire about a closing date.[2] According to Thomas, Youngblood indicated that an attorney he had consulted did not believe that the Youngbloods were getting enough money for the property. Thomas testified that Youngblood stated that he was still considering what to do. Although Youngblood did not state that he would not sell the property, Thomas testified that it seemed *Page 1125 
to him that Youngblood wanted to withdraw from the contract. Thomas testified that he again offered to send the closing documents to him and that Youngblood again told him that he wanted to close in person. Youngblood, however, testified that he did not discuss closing by mail.
Lucille Youngblood admitted that she had communicated with Thomas on February 2, 2005, and she also agreed that, after the contract was executed but before the 45-day period to close had expired, someone told her that the property was worth more money than the selling price stated in the contract. She, however, testified that she never communicated that information to Ellis or Thomas, and J.B. Youngblood testified that he did not recall telling Ellis or Thomas that information either. Lucille Youngblood testified that Thomas asked for the Youngbloods' Social Security numbers but that she would not give the numbers to him because, she said, it was not necessary to do so before the closing. She testified that she did not indicate to Thomas that she was not willing to close.
Thomas testified that he left a message for the Youngbloods on February 7, 2005. The following day, he relayed the content of his February 2, 2005, telephone conversation with the Youngbloods to Ellis. Ellis indicated to Thomas that he still wanted to complete the transaction per the terms of the contract. Therefore, on February 9, 2005, Thomas mailed J.B. Youngblood a copy of the original contract, a proposed addendum to the contract, and a letter stating:
 "I have enclosed an addendum to the original December 27, 2004 contract extending the closing time by an additional 30 days given your 2 requests for additional time to travel to Alabama to close the property. After speaking with Mr. Earl Ellis on February 8, 200[5] and with you on February 2, it appears you may not be willing to honor your commitment to sell the property to Mr. Ellis. Given Mr. Ellis's investment of time and money, along with your verbal and written promises to sell the property, Mr. Ellis does not intend on letting the contract lapse. As you may know, a written contract to sell real estate is specifically enforceable. Therefore, Mr. Ellis will pursue legal action in Pike County to compel your sell [sic] of the property.
 "If you do not intend on honoring your previous commitment to sell the property, please let me know if you will be retaining an attorney to represent you so I may communicate with that individual in the future. On the other hand, if you will honor your contract, please execute the enclosed addendum extending the closing date to March 14, 2005 and return it to my office using the enclosed envelope.
 "Should you have any questions, please feel free to call."
Lucille Youngblood testified that she received this letter on February 10, 2005. She testified that she did not take any action in response to the letter; she believed that she was not obligated to close on the property because, she said, the contract had expired. Lucille Youngblood denied that she had asked for additional time to travel to Alabama to close. She further denied having any telephone conversations with Thomas regarding setting up the closing date during the 45-day period after the contract was executed. J.B. Youngblood denied having any conversations whatsoever with Thomas during that time period.
After Thomas mailed the February 9, 2005, letter, Ellis and Thomas discussed the possibility of filing a lawsuit seeking specific performance. They decided that they should perform a title search before *Page 1126 
filing suit, and on April 11, 2005, a title search was conducted. Pursuant to that search, Thomas discovered some title complications, and it appeared that the Youngbloods did not have full title to the property. Therefore, on June 6, 2005, Thomas mailed J.B. Youngblood a letter stating, in pertinent part:
 "I assume you have decided not to go forward with the sell [sic] of your real property to Mr. Ellis. Therefore, I am closing my title file on this matter. I thought you would like to know that we discovered a problem with the title when we did the title search for Mr. Ellis. . . .
 "Given the fact it appears you only own a 1/3; interest in the property, I suggest you retain an attorney to obtain deeds for the two-thirds interest owned by Dot and Carrie [J.B. Youngblood's siblings]. Finally, Mr. Ellis has indicated that if you change your position on the sell [sic] of the property he is still interested in moving forward with the purchase."
Thomas testified that at the time the June 6, 2005, letter was mailed, it was clear that the Youngbloods were in breach of the contract; they would not sign the extension agreement or return his telephone calls. Thomas testified that he sent the June 6 letter with the intent of trying to determine if the Youngbloods had full title to the property. He testified that the letter indicated that in order for the Youngbloods to perform, they must acquire a deed from Lucille Youngblood's siblings. Ellis testified that the only way he would buy the property was with a clear title; he, however, testified that, in the June 6, 2005, letter, he was not rescinding the contract and was still ready and willing to purchase the property if the title problem could be corrected. Thomas agreed that the June 6 letter was not a notice of rescission or termination of the contract.
On direct examination, Lucille Youngblood testified that she interpreted the June 6 letter as stating that Ellis no longer wished to purchase the property. She stated that, based on that letter, she thought the contract was terminated, and she did not have a problem with that. On cross-examination, however, she testified that the letter indicated to her that if she changed her mind and wished to sell the property, Ellis was still interested in purchasing the property if they could clear the title issues.
In response to the June 6 letter, Lucille Youngblood hired an attorney to investigate the title issue. That attorney located an unrecorded document that resolved the title issue. In the meantime, Thomas also learned about the unrecorded document that cleared up his concerns over whether the Youngbloods had full title to the property.
The Youngbloods testified that they did not close on the property within 45 days after the contract was executed because a closing date was never set. Lucille Youngblood testified that she was waiting on Ellis to set a date and that she did not attempt to set up an appointment to close. Lucille Youngblood testified that, during the 45 days after the contract was executed, there was no reason they could not have closed. J.B. Youngblood testified that if the closing had taken place within 45 days of the execution of the contract, he and Lucille Youngblood would have sold the property. The Youngbloods both maintain that they never refused to close during the 45 days after the contract was signed.
Ellis testified that he never stated that he did not want to close on the property and that it has always been his intent and desire to close the transaction. *Page 1127 
 Standard of Review
"When the decision of the trial court to grant or to deny specific performance is based on ore tenus evidence, its decision will not be overturned on appeal unless it is shown to be plainly and palpably wrong." Shacklette v. Drawdy,816 So.2d 486, 488 (Ala.Civ.App. 2001).
 Discussion
On appeal, the Youngbloods argue that the trial court erred by ordering specific performance of the contract because, they say, Ellis abandoned the contract and effectively rescinded the contract. We disagree.
The Youngbloods cite Moore v. Lovelace, 413 So.2d 1100
(Ala. 1982), in support of their argument that Ellis abandoned the contract. In Moore, the Supreme Court concluded that because time was of the essence in a certain real-estate contract, the purchaser was not entitled to specific performance of the real-estate contract because the closing had not occurred within the designated time. The Youngbloods argue that in the present case time was of the essence and that, because the closing did not occur within the designated time, Ellis is not entitled to specific performance of the contract.
Ellis argues, however, that Moore, supra, is distinguishable from the present case. In Moore, as in this case, the potential buyer was the party seeking specific enforcement. The evidence in Moore, however, indicated that the buyer had been responsible for not closing before the deadline. There was no evidence indicating that the potential sellers, the parties seeking to avoid specific performance of the contract, had contributed to the delay. In the present case, however, the trial court concluded that Ellis attempted to close on the property but was thwarted in his efforts by the Youngbloods' dilatory tactics.[3]
We do not read Moore as allowing a potential seller to intentionally delay closing until after the deadline and then to refuse to close on the basis that the contract had expired; such an interpretation of the holding in Moore would certainly not advance the principles of equity. Because in the present case the trial court could have found that the Youngbloods, and not Ellis, were responsible for the failure to close before the 45-day deadline, we do not conclude that Ellis abandoned the contract.
In support of their argument that Ellis rescinded the contract, the Youngbloods cite Henderson v. Winkler,454 So.2d 1358 (Ala. 1984). In Henderson, the Supreme Court stated: "[W]here the acts and conduct of one party are inconsistent with the existence of a contract and are acquiesced in by the other, such contract will be treated as abandoned or rescinded." 454 So.2d at 1361. The Youngbloods argue that the language in the June 6 letter was inconsistent with what a person would write if that person assumed the existence of a contract.
The plain language of the June 6 letter, however, indicates that Thomas had concluded that the Youngbloods had decided not to sell the property. Further, Thomas testified that, at the time he wrote the June 6 letter, he believed that the Youngbloods had already breached the contract; *Page 1128 
in fact, he and Ellis had already discussed whether to file a lawsuit seeking specific performance. The letter stated, and Ellis's testimony confirmed, that Ellis still intended on purchasing the property per the terms of the contract if the title issues could be remedied. Accordingly, the trial court could have correctly concluded that the June 6 letter did not effectively rescind the contract.
Based on the foregoing, we affirm the trial court's judgment.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.
[1] Lucille Youngblood denied that there was flooding in their home state during that time.
[2] According to a subsequent letter, this conversation occurred on February 2, 2005.
[3] The Youngbloods do not take issue with the fact that Ellis did not tender payment before the 45-day deadline; therefore, we do not address that issue. See Shewmake v.DelGreco, 926 So.2d 348, 352 n. 4 (Ala.Civ.App. 2005) ("`"`[N]o matter will be considered on appeal unlesspresented and argued in brief.'"'" (quoting Tuckerv. Cullman-Jefferson Counties Gas Dist., 864 So.2d 317,319 (Ala. 2003), quoting in turn other cases)).